# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Heather Jennings, individually and on behalf of others similarly situated,<br><br>                        Plaintiff,<br><br>vs.<br><br>Cellco Partnership d/b/a Verizon Wireless,<br><br>                        Defendant. | Court File 0:12-cv-00293-SRN-TNL<br><br><br>**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION** |

## I.    INTRODUCTION

Plaintiff Heather Jennings asks this Court to facilitate judicial notice of this wage and hour action to nearly 800 of her former coworkers based on a theory that, despite the existence of well-publicized policies requiring employees to accurately and independently report all of their working time, as well as mandatory training regarding those requirements, Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") actually established a "policy-to-violate-its-policy" and directed Plaintiff and other employees to work without pay.  According to Plaintiff – who has now been deposed regarding her personal overtime claim – she felt she needed to perform certain tasks "off-the-clock" in order to meet Verizon Wireless's performance expectations, or to avoid unspecified "discipline."  No one ever told Plaintiff to falsify her time records – she knew it was wrong – and based on her training, Plaintiff was well aware that she was supposed to report all of her hours worked.  Based upon Verizon Wireless's Code of Conduct, she also knew that creating false records – or directing others to do so – was a terminable offense.  She never complained about her pay before she was discharged for

being disrespectful to customers (except to her lawyers).  She was aware of how to lodge a complaint as she had utilized Verizon Wireless's Code of Conduct and Compliance Guideline to report other workplace concerns.  Plaintiff has her own reasons that she decided to violate Verizon Wireless's policies which are unique to her, and Verizon Wireless has pled and will prove legal defenses to her overtime claim, grounded in her admissions at her deposition, the Company's policies, her training, her supervisor's testimony, and her employment history.

A few former coworkers have joined Plaintiff in this case, and they likewise claim to have violated Verizon Wireless's timekeeping policies for reasons that are unique to them.[1]  While these allegations, viewed collectively, permit the Court to infer intermittent instances of unreported working time by these individuals, they do not support an inference that Verizon Wireless had an unwritten, widely-applied policy of requiring off-the-clock work, in clear violation of its very clear written policies prohibiting such activity.  Accordingly, there is no conceivable way this case could be tried on a representational basis.  For each current or former employee who claims for personal reasons to have performed work off-the-clock, Verizon Wireless is entitled – consistent with its due process rights – to present testimony from coworkers and supervisors disproving the factual foundation for each claimant's excuse for falsifying his or her time record.  The Court must exercise its discretion here to deny Plaintiff's motion because

---

[1] Of approximately 789 employees and former employees who are potential participants in a collective action, only 10 have opted-in to date, despite aggressive solicitation by Plaintiff's counsel.

this case is not and could never be appropriate for treatment as a collective action under the federal Fair Labor Standards Act.

## II.    SUMMARY OF RELEVANT FACTS

### A.    Verizon's Mankato Operations.

Headquartered in Basking Ridge, New Jersey, Verizon Wireless is the industry leader in wireless voice and data services. [2]   Verizon Wireless's customer service operations are supported by its inbound call centers, including a facility in Mankato, Minnesota ("the Mankato Call Center").  Verizon Wireless began operating the Mankato Call Center in February 2009 in connection with Verizon Wireless's merger with Alltel. Declaration of Joe Hall ("Hall Decl.") ¶ 2.

Since February 2009, Verizon Wireless has employed approximately 789 "Representatives" [3] at the Mankato Call Center.  *Id.* at ¶ 4.  Each is assigned to a team of approximately 10-12 Representatives who report to a common Supervisor.  *Id.*  Each Supervisor, in turn, reports directly to an Associate Director, who reports to Joe Hall, Director Customer Service.  *Id.*  Verizon Wireless has employed 84 Supervisors and 12 Associate Directors at the Mankato Call Center since February 2009.  *Id.*

---

[2] *See* About Us Facts-at-a-Glance,  http://aboutus.verizonwireless.com/ataglance.html.

[3] Verizon Wireless employs two categories of telephone-dedicated employees at the Mankato Call Center.  Hall Decl. ¶ 3.  Customer Service Representatives and Senior Customer Service Representatives primarily respond to customers' billing inquiries.  *Id.* Technical Support Coordinators I and Technical Support Coordinators II primarily troubleshoot customers' technical device issues.  *Id.*  Employees who hold these four positions are referred to collectively as "Representatives."  Verizon Wireless does not concede that employees who hold these positions are similarly situated to one another.

**B.      Verizon Wireless's Wage and Hour Compliance Program.**

      **1.      VZWTime: Verizon Wireless's Independent Representative Timekeeping Program.**

As an "off-the-clock" wage and hour case, the mechanics of Verizon Wireless's timekeeping system, the policies and guidelines surrounding its use, the training employees receive regarding these procedures, as well as the safeguards in place to ensure this timekeeping system functions as intended, will all be critical facts that will impact the adjudication of Plaintiff's claim – as well as allegations made by any other Representative that he or she was not paid for all hours worked.  It is undisputed – even at this "initial stage" of the litigation – that Verizon Wireless's employment policies uniformly require Representatives to independently record their actual work start-and-stop times each day and prohibit off-the-clock work.  This consistent rule is emphasized not only in workplace timekeeping policies, but also in mandatory supervisory and non-supervisory training and in Verizon Wireless's Code of Conduct.

Unlike some call centers where employees are compensated based on pre-established work schedules or "tours" (subject to "exception" reporting) or "to-the-switch" (*i.e.*, based on time spent logged-in to a telephone system), Verizon Wireless does not presume its Representatives work any particular number of hours.  To the contrary, to effectuate its timekeeping policies, Representatives use an electronic timekeeping program called "VZWTime" in which each Representative independently records her or his hours of work.  Hall Decl. ¶ 5.  VZWTime is accessible via the "About

You" intranet portal on each Representative's work computer.  *See* Hall Decl. Ex. 1, Time and Labor – Non-Exempt Employee Time Entry training module, p. 9.

Representatives are trained that "all time worked should be reported to the minute" in VZWTime. [4]  *Id.* at p. 14.   They may also add explanatory comments to their VZWTime entries.  *Id.* at p. 15.  Each week, Representatives are required to submit their VZWTime records for approval and payroll processing; Representatives thereby verify the accuracy of their VZWTime records.  *Id.* at p. 24.  If post-submission changes to VZWTime records are warranted, Representatives generally have six weeks after submission to request that their Supervisors make such changes.  *Id.*  Unlike other timekeeping cases, there is no allegation in this case that Verizon Wireless has "shaved" time – *i.e.*, modified any timesheet self-reported by its employees.

Plaintiff and all of the opt-in plaintiffs deposed were trained on VZWTime, and each knew she was supposed to record her actual working time in VZWTime, to the minute.  *See* Transcript of the Deposition of Heather Jennings ("Jennings Dep.") 89-90, 97; Transcript of the Deposition of Rose Marie ("Marie Dep.") 80, 177-180; Transcript of the Deposition of Christina Montenegro ("Montenegro Dep.") 79-82; Transcript of the

---

[4] This instruction mirrors information provided Representatives when the Mankato Call Center was acquired by Verizon Wireless – that Representatives "will be paid for actual time worked" and their "[t]imesheets must reflect the actual arrival and departure times." *See* Legacy Alltel Call Center Attendance Guidelines Modifications at p. 1, annexed as Ex. 2 to the Hall Decl.

Deposition of Pamela Larson ("Larson Dep.") 59-61.[5]  They also understood that by submitting their VZWTime records for approval and payroll processing each week, they were verifying the accuracy of these records to Verizon.  Jennings Dep. 70-71, 98; Marie Dep. 92-93, 181; Montenegro Dep. 65.

### 2.    VZWTime Policy: Recording Your Time Accurately.

The mechanics of VZWTime, and Verizon Wireless's explicit instructions to Representatives regarding how to use this software, is also emphasized by policy, described in a training document entitled "VZWTime: Recording Your Time Accurately."[6]  This policy explains – in a plainly-drafted question-and-answer format – Representatives' timekeeping obligations, instructs Representatives to login to the phone *before* commencing any other work-related activities, and provides a resource for Representatives to address timekeeping questions and concerns.  The policy poses the following illustrative questions and answers that directly address Plaintiff's allegations:

> **Q:  If I am overtime eligible when should I record my time?**
>
> A.  You should record your time – your actual start and end for your shift and your lunches – on a *daily* basis.
>
> <div align="center">***</div>
>
> **Q:  What does recording my actual start and end time mean?**

---

[5] Cited excerpts of the Jennings Dep., Marie Dep., Montenegro Dep., and Larson Dep. are respectively annexed as Exhibits 1 through 4 to the Declaration of Jeffrey A. Timmerman ("Timmerman Decl.").

[6] The current VZWTime: Recording Your Working Time Accurately policy (dated April 5, 2010) is annexed as Ex. 3 to the Hall Decl.  Its predecessor (dated March 26, 2008) is annexed as Ex. 4 to the Hall Decl.

A:  It means that you must record the actual time you began and ended work and the time you began and ended each lunch.

<center>***</center>

**Q:  How exactly is "work" defined?**

A:  "Work" includes all work-related activities during your scheduled work hours, as well as all activities required by your supervisor or necessary to do your job that you may perform outside of your scheduled work hours, such as reading and/or responding to work-related emails through Webmail or on your Company-provided laptop, BlackBerry or other mobile device, taking required training, working at your desk through lunch, taking or returning calls to customers, and submitting your time.  You will be paid for all "work" time.

<center>***</center>

**Q:  Will I be paid for all work done outside my scheduled hours, even if my supervisor does not approve it in advance?**

A:  Yes, it is our policy to pay for *all* hours worked – including work performed before and after your scheduled shift, during your lunch, and outside of the workplace – regardless of whether you've received prior approval from your supervisor.

<center>***</center>

**Q:  When does "work" begin?**

A:  "Work" begins with your first activity of the day that is necessary to perform your job.  In Customer Care, for example, ***this should be your phone log-on***.  But if you perform necessary work prior to that such as attending team meetings, or reading materials required by your job – record that time and you will be paid for that time.

<center>***</center>

<center>7</center>

**Q:  Computer Log-in/Log-off time?**

A:  You should log on at the beginning of your shift, not before.  But if you log on early and commence work, it is our policy that you should record this time, beginning with the first step in the log-on process, and you will be paid for that time.

*** 

**Q:  If I have any questions or concerns about how to record my time, what should I do?**

A:  You can access the Time and Labor on-line training through About You>Learning>VZLearn.  Or contact your supervisor or Human Resources.

Hall Decl., Ex. 3.

In addition to training regarding how to use Verizon Wireless's timekeeping software, Plaintiff and the opt-in plaintiffs also received specific training on the VZWTime policy, and they understood the policy required them to accurately record their actual working time, including any time spent booting-up and shutting-down their work computers and reviewing work-related materials before and after their scheduled shifts.  Jennings Dep. 105-109; Marie Dep. 119-121; Montenegro Dep. 71-74; Larson Dep. 48-56.

### 3.      Verizon Wireless's Code of Conduct.

All of these timekeeping rules and policies are supported and enforced through Verizon Wireless's Code of Conduct.   This Code, in relevant part, requires Representatives to "create accurate records that reflect the true nature of the transactions and activities that they record (including, but not limited to, **reporting of time**, documenting attendance and absence, productivity, commissions and quality assurance)."

*See* Hall Decl. Ex. 5, Code of Conduct, § 3.1.1.[7]  Indeed, the Code of Conduct specifically addresses Representatives' obligation to accurately record their actual working time:

### 3.3.3  Work Time

> You must keep accurate records regarding your work time. You may not instruct another employee to misreport or fail to report any time worked.  Overtime eligible employees must report all time worked.  By submitting your time, you are representing that you have accurately reported your time and that you have not performed any work not reported.  You may report any questions about time reporting, or any concerns you have about the accuracy of your wages, including any claim that you have not been paid for all hours worked, or that any deductions from your wages are improper or in error, to Human Resources, the Verizon Services Payroll Department or to the Compliance Guideline.

Hall Decl., Ex. 5 at § 3.3.3.

As this "Work Time" provision advises, Verizon has established a number of ways for Representatives to report actual or suspected Code of Conduct violations – including self-violations compelled by a supervisor.  Reports may be made to a variety of different corporate resources anonymously, confidentially, and without fear of retaliation.   Hall Decl., Ex. 5, pp. 1-3; §§ 3.1.1, 3.3.3.

Plaintiff and opt-in plaintiffs were trained on the Code of Conduct, and they understood the Code required them to accurately record their actual working time. Jennings Dep. 57-71; Marie Dep. 82-93; Montenegro Dep. 56, 65.  Consistent with this

---

[7] Verizon Wireless's current Code of Conduct is annexed as Ex. 5 to the Hall Decl.  The previous iterations of Verizon's Code of Conduct in effect at the Mankato Call Center since February 2009 – annexed as Exs. 6 and 7 to the Hall Decl. – contain similar provisos.  *See* Hall Decl., Ex. 6 at § 3.1.1; Ex. 7 at § 3.1.1.

training, each Representative knew she could report suspected violations of the Code's timekeeping rules.  Jennings Dep. 59-60, 64, 68; Marie Dep. 84-93; Montenegro Dep. 58-61; Larson Dep. 91.  For her part, Plaintiff *relied* upon the Code of Conduct when she had concerns regarding the manner in which the Mankato Call Center responded to a weather emergency.  Jennings Dep. 60, 189-191.  She contacted the Compliance Guideline and reported her concerns, the matter was investigated, the local procedures for responding to tornado warnings were changed, and Plaintiff was entirely satisfied with the result of this investigation.  *Id.*  She never used the Compliance Guideline to complain that she felt that Verizon Wireless was making her work without pay, however.  *Id.* at 26, 191-192.  Neither did any of the opt-in plaintiffs.  Marie Dep. 87-89, 93, 103; Montenegro Dep. 60; Larson Dep. 91-92.

## C.  Verizon Wireless's Separate Scheduling, Telephone, and Email Systems.

### 1.  IEX: Verizon Wireless's Scheduling System.

Plaintiff complains she felt "compelled" to work off-the-clock by the demands of her job, and she points to other software systems and her understanding of what they required to support her claim.  The facts establishing how these systems function and how they are used to manage work at the Mankato Call Center are also undisputed.

Verizon uses a system called IEX to schedule Representatives' working hours each week.  Hall Decl. ¶ 12.  IEX ensures that the Mankato Call Center is adequately staffed based on anticipated call volume at various times of the day and week.  *Id.*  Each Representative's workday is scheduled at a granular level in IEX.  *Id.*  For example, IEX

reflects the times Representatives are scheduled to leave for and return from breaks, lunches, on- and offline training sessions, coaching meetings, one-on-one sessions, team meetings (or "huddles"), off-phone work sessions, and other pre-planned work-related events. *Id*.

Supervisors are able to code additional time in IEX throughout the workday. Hall Decl. ¶ 12. For instance, if work computers are reacting slowly on a particular day, Supervisors will code extra off-phone time in their IEX schedules to account for systems issues. *See* Transcript of the Deposition of Chad Gumbel ("Gumbel Dep.") 89-90.[8] Or if a Representative requests off-phone time to research a particularly tricky customer issue, Supervisors will build this time into his or her IEX schedule. *Id*. at 106.

### 2.      Aspect – Verizon Wireless's Phone System.

Representatives at the Mankato Call Center use the Aspect phone system to interface with customers. Hall Decl. ¶ 13; Gumbel Dep. 37. They login to Aspect via a stand-alone touchpad that is not connected to their work computers. Hall Decl. ¶ 13; Gumbel Dep. 37. Aspect permits Representatives to use a variety of buttons to track their on- and off-phone time each workday, including "Ready" (to be placed in the call queue), "Break" (to begin a scheduled rest break), "Lunch" (to begin a scheduled meal break), "Meeting" (to begin a scheduled meeting), "Personal" (to take unscheduled off-phone time), "Wrap" (to complete account work that extends beyond the end of a call), and "End Duty" (to be removed from the call queue). Hall Decl. ¶ 13. Representatives are also able to be logged-in to Aspect in an uncoded state – referred to as "Idle." *Id*. "Idle"

---

[8] Cited excerpts of the Gumbel Dep. are annexed as Ex. 5 to the Timmerman Declaration.

reflects time spent logged-in to Aspect outside the call queue and not in any pre-designated off-phone code. *Id.*

Consistent with Verizon Wireless's policies requiring Representatives to (1) login to Aspect each workday *first*, before commencing all other work-related activities, and (2) logout of Aspect each workday *last*, after completing all other work-related activities, the actual work start-and-stop times Representatives record in VZWTime should generally mirror their corresponding Aspect login and logout times.  Hall Decl. ¶ 14; Gumbel Dep. 133-134.   This is so because, per Verizon Wireless's policies, Representatives' Aspect login and logout times should be inclusive of their work start-and-stop times.   Hall Decl. ¶ 14; Gumbel Dep. 134.   Of course, if Representatives perform work outside the time they are logged-in to Aspect, they are nevertheless instructed to independently record this working time in VZWTime.   Hall Decl. ¶ 14; Gumbel Dep. 20-21, 65-66, 133; Declaration of Travis Meyer ("Meyer Decl.") ¶ 7; Declaration of Dayna Cobb ("Cobb Decl.") ¶ 6; Declaration of Sarah Laughter ("Laughter Decl.") ¶ 7.

Since February 2009, Representatives have been trained and instructed to login to Aspect at any time between five minutes before the start of a scheduled shift and five minutes after the start of a scheduled shift – a ten-minute window.  Gumbel Dep. 19-21, 36-37, 39, 70-71, 135-136.   Representatives are also trained and instructed to boot-up their work computers *after* logging-in to Aspect, and to log-off their work computers *before* logging-out of Aspect.  *Id.* at 20, 38, 42, 56-57; Meyer Decl. ¶ 7; Cobb Decl. ¶ 6; Laughter Decl. ¶ 7.  They are further trained and instructed to remain in an "Idle" state or

use the "Personal" button to account in Aspect for time spent booting-up and shutting-down their work computers at the beginning and end of their workdays, respectively. Gumbel Dep. 38-41, 47, 57, 66.

### 3.   Outlook: Verizon Wireless's Email Program.

Each Representative at the Mankato Call Center uses the Microsoft Outlook email program.   Hall Decl. ¶ 15.   Representatives rarely communicate with customers via email; rather, the vast majority of the emails they receive are internal companywide Verizon communications, most of which do not pertain to them.   Gumbel Dep. 51-53; Montenegro Dep. 170-171; Larson Dep. 123-124.

Representatives are trained and instructed to review email between calls – not at the start of their shifts.   Gumbel Dep. 46-47, 51-52; Marie Dep. 123-124; Larson Dep. 123.  In the event there is insufficient time between calls to review email, Representatives are not expected to do so.   Gumbel Dep. 53.   Most relevant technical or promotional updates Representatives need to assist customers communicated via email are also available to them as resources in ACSS (the primary program Representatives use to interface with customers) and are relayed to them in team "huddles."   *Id.* at 29, 40-41, 46-47 51-53, 135; Larson Dep. 129-132; Montenegro Dep. 169-170.

### D.   Verizon Wireless's Metrics Used to Evaluate Representatives' Performance.

Verizon Wireless evaluates Representatives' performance based on four metrics:

**(1) Adjusted Calls Per Day (or "ACPD")**, which measures the average number of calls Representatives field each day adjusted for between-call wait times; **(2) Entire Rep**

**Performance (or "ERP")**, which measures Representatives' overall service customer survey scores; **(3) Did Rep Resolve (or "DRR")**, which measures Representatives' issue resolution customer survey scores; and **(4) Upgrades & Data Features**, which measures Representatives' upselling penetration.  Gumbel Dep. 118-119; Hall Decl. ¶ 16.  These are the only metrics used to formally evaluate Representatives' performance.  *Id.*

Other ancillary metrics are used for coaching purposes and to identify Representatives experiencing broader performance problems, including "adherence" and "conformance."  Gumbel Dep. 111-112; Hall Decl. ¶ 17.  Adherence and conformance are "FYI" statistics, meaning they are not part of Representatives' formal performance appraisal process.  Gumbel Dep. 111-112, 131; Hall Decl. ¶ 17.

"Adherence" measures Representatives' adherence to their scheduled breaks and lunches – *i.e.*, whether Representatives leave for and return from breaks and lunches at the pre-designated times identified in their IEX schedules.  Gumbel Dep. 111; Hall Decl. ¶ 18.  "Conformance" compares the time Representatives are scheduled to be fielding customer calls as reflected in IEX with the time Representatives actually spend fielding customer calls as reflected in Aspect.   Gumbel Dep. 103-104; Hall Decl. ¶ 19. Representatives are expected to achieve 97% conformance 80% of the time.  Gumbel Dep. 103-104; Hall Decl. ¶ 19.  That is, Representatives are expected to be available for customer calls 97% of the time they are scheduled to do so each workday, and they are expected to meet this 97% daily conformance goal on 80% of their workdays each month.  Hall Decl. ¶ 19.  Conformance does ***not*** measure working time Representatives record in VZWTime – actual working time is not factored into conformance.  Hall Decl.

¶ 20; Montenegro Dep. 52-53.  In other words, a Representative may enter her ***actual*** work start and stop times in VZWTime without affecting her conformance – even if those times differ from her corresponding phone login/logout times.  Hall Decl. ¶ 20.

Practically speaking, conformance affords full-time Representatives the functional equivalent of an extra paid rest break each workday.  Hall Decl. ¶ 21.  For example, if a Representative is scheduled to receive customer calls for 420 minutes on a particular workday, she need only actually be in the call queue for 407.4 minutes to meet the 97% daily conformance goal – the Representative is free to use the residual 12.6 minutes for any purpose.  *Id.*; Gumbel Dep. 49; Montenegro Dep. 148-149 (recalling the conformance goal provided her 13 minutes of off-phone free time each workday).  To meet the monthly conformance goal, Representatives need only meet the daily conformance goal 80% of the time, which means they can achieve less than 97% daily conformance four workdays each month and still meet the monthly conformance goal.  Hall Decl. ¶ 22; Gumbel Dep. 103-104, 108, 114-115.  In practice, Representatives are not coached on conformance until they fall well below the 80% monthly conformance goal.  Hall Decl. ¶ 22; Gumbel Dep. 119.

Significantly, the time that Representatives spend logged-in to the phone before and after their scheduled shift is ***not*** included in the conformance measurement.  Hall Decl. ¶ 23; Gumbel Dep. 112-113, 131-132.  If a Representative codes her or his phone to "Personal" or leaves it in an "Idle" state while booting-up and shutting down her or his work computer pre- and post-shift, that time does not count toward her or his 97% daily conformance goal.  Hall Decl. ¶ 23; Gumbel Dep. 112-113, 131-132.

E.     The So-Called "Factual Nexus" of Plaintiff's Allegations.

Against the backdrop of Verizon Wireless's vigorous wage and hour compliance policies and programs, Plaintiff claims all Representatives at the Mankato Call Center were uniformly denied FLSA-required overtime compensation.  Yet she admits overtime was encouraged at the Mankato Call Center, and that she never had any trouble obtaining approval to work overtime.  Jennings Dep. 32, 101-102; Larson Dep. 166-167.  Indeed, since February 2009, Verizon Wireless has paid over $2,400,000 in overtime compensation to employees at the Mankato Call Center.  Hall Decl. ¶ 24.  Plaintiff never availed herself of Verizon Wireless's complaint mechanism by contacting the Compliance Guideline to report pay concerns – she only decided to pursue an overtime claim against Verizon Wireless after receiving a solicitation notice from her counsel while she was still employed at the Mankato Call Center.  Jennings Dep. 16-20, 26, 191-192.

Plaintiff's conditional certification motion is premised exclusively on boilerplate declarations obtained from six former employees (0.76% of the putative collective class) who purport to create a factual nexus between their individual claims and those of 779 other Representatives who have not asserted a legal claim by suggesting Verizon Wireless maintained a uniform "policy-to-violate-the-policy" at the Mankato Call Center – *i.e.*, that local management maintained an unwritten policy that violated Verizon Wireless's written policies requiring Representatives to record all of their actual working time and prohibiting them from working off-the-clock.  *See* ECF No. 18-2.

The individual claims of even this small subset of Representatives diverge widely, however.  Any may claim: (1) her supervisor told her that she needed to be "call ready" when she logged into the phone, notwithstanding the VZWTime policy and Code of Conduct mandate; (2) her supervisor "implied" that this was the case, based upon statements regarding adherence and conformance expectations; (3) she personally chose to ignore her Supervisor's instruction to wait until the start of her shift to boot-up her work computer; or (4) she independently decided to falsify her time records to improve her productivity, as Plaintiff herself alleges.  Jennings Dep. 80-83, 182-183; Montenegro Dep. 26, 42-43, 50-51; Marie Dep. 121-122; Larson Dep. 37-38, 105; Engelby Decl. ¶ 5; Frederick Decl. ¶ 5.[9]  Some claim they were denied overtime compensation for post-shift off-the-clock work, others do not.  *Compare* Engelby Decl. ¶ 7; Frederick Decl. ¶ 7; Larson Dep. 141-146; *with* Jennings Dep. 132; Marie Dep. 125.  Plaintiff and the opt-ins claim they *followed* Verizon's Wireless's timekeeping policies on some days but violated those same policies on other days; they are not claiming entitlement to additional compensation on days when they chose to comply with VZWTime and report all their hours worked.   Jennings Dep. 137-140, 165-183; Marie Dep. 199-200, 204-207; Montenegro Dep. 87-125, 152-153; Larson Dep. 64-83, 94-98.  The opt-in plaintiffs deposed testified they independently decided to begin recording all of their actual

---

[9] For their part, the Supervisors identified in the declarations filed in support of Plaintiff's motion deny having ever instructed Representatives to be "call ready" prior to logging into the phone, which underscores the individual defenses Verizon Wireless has to each claimant's claims consistent with its due process rights.  Gumbel Dep. 19-21, 36-42, 56-57, 66, 70-71, 135-136; Meyer Decl. ¶¶ 6-7; Cobb Decl. ¶ 6; Laughter Decl. ¶¶ 6-7.

working time in VZWTime – including the pre-shift time at issue in this case.[10]   Marie

Dep. 204-207; Montenegro Dep. 115-120; Larson Dep. 83.   They were paid for all of this

time and were never disciplined or coached for recording their actual working time in

VZWTime.  Montenegro Dep. 99, 101, 105, 109, 115-120; Larson Dep. 67-69.

Other Representatives who have not joined this lawsuit refute the existence of any

"policy-to-violate-the-policy" at the Mankato Call Center.  These Representatives follow

Verizon Wireless's policies by logging-in to the phone *before* booting-up their work

computers and logging-out of the phone *after* powering-down their work computers.

Declaration of Kristi Curran ("Curran Decl.") ¶¶ 7-12; Declaration of Bethany Towle

("Towle Decl.") ¶¶ 5-7; Declaration of Richard Pepper ("Pepper Decl.") ¶¶ 5-7;

Declaration of Adam Brown ("Brown Decl.") ¶¶ 5-7.  They follow Verizon Wireless's

policies because, understandably, they want to be paid for all of their working time.

Curran Decl. ¶ 15; Towle Decl. ¶ 10; Pepper Decl. ¶ 9; Brown Decl. ¶ 10.

In summary, Plaintiff presents nothing more than a mishmash of alleged episodic,

self-initiated FLSA violations contrary to written policies and training – hardly the types

of claims that are appropriate for adjudication on a representative basis.  Her evidence

falls far short of demonstrating a corporate "policy-to-violate-the-policy" was established

at the Mankato Call Center that compelled Representatives to work for free.

---

[10] In fact, opt-in plaintiff Christina Montenegro admits that some days she physically entered the Mankato Call Center *after* the start time she recorded in VZWTime. Montenegro Dep. 96, 98, 103, 124, 132.  She obviously was not performing any work prior to entering the building, and admits to falsifying her VZWTime entries on these days. *Id.* at 98-99, 103, 124.

## III.   LEGAL ARGUMENT

### A.   The Standard Governing Plaintiff's Motion for "Conditional Certification."

#### 1.   Plaintiff Cannot Avoid Her Burden of Proof By Urging a "Lenient" Review of the Evidence.

The FLSA does not expressly authorize the judicial intervention that Plaintiff seeks.   The Act simply permits individuals to bring an action for unpaid overtime on behalf of themselves "and other employees similarly situated."   29 U.S.C. § 216(b). Whether the Court intervenes as Plaintiff has requested is a matter committed to judicial discretion.   In *Hoffman-LaRoche, Inc. v. Sperling*, the Supreme Court held that district courts "have discretion, in appropriate cases . . . to implement" the collective action mechanism under Section 216(b) "by facilitating notice to potential plaintiffs."   493 U.S. 165, 169 (1989).   In support of this conclusion, the Court pointed to the systemic benefits derived from a process that permits the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity."   *Id.* at 170, 172-74 (Rule 83 and Courts' authority to "regulate their practice" supports Court's holding).   This Court must decide, therefore, whether this is an "appropriate" case to issue notice, regardless of the standard applied.   *See Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1233 (M.D. Ala. 2003) ("The power to authorize notice must . . . be exercised with discretion and only in appropriate cases").

The Eighth Circuit has not endorsed any specific standard for determining whether notice should issue in a particular case, *see Huang v. Gateway Hotel,* 248 F.R.D. 225, 227 (E.D. Mo. 2008), and the Circuit Courts "have provided very little guidance about

when a class should be conditionally certified and court-supervised notice authorized in an FLSA action." *Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 939 (D. Minn. 2009), *affirming* 2009 U.S. Dist. LEXIS 49891 (D. Minn., June 15, 2009).   Naturally, Plaintiff emphasizes the "leniency" of "notice stage" certification without the benefit of discovery, [11] urging this Court to certify a collective action regardless of whether, ultimately, this case could be tried on a representational basis.   Even at the notice stage, however, Plaintiff must prove that some identifiable factual nexus binds her together with all current and former Representatives in Mankato:   "What the case law of this District requires is that the putative class members be the '*victims* of a single decision, policy, or plan'[.]"   *Id.* at 940 (italics in original, quoting *Burch v. Qwest Commc'ns Int'l, Inc.*, 500 F. Supp. 2d 1181, 1186 (D. Minn. 2007)).   *Hoffman-LaRoche* emphasized the efficiencies to be gained by litigating a collective action where there are common issues of law and fact arising from the same alleged activity, *see* 493 U.S. at 170, "but [*Hoffman-LaRoche's*] focus does not mandate that district courts send out notice when it appears that an FLSA case will be unmanageable as a collective action."   *Saleen*, 2009 U.S. Dist. LEXIS 49891, *28.   This is especially true when "certification" and notice will substantially increase the costs associated with litigation.   *See Williams v. Accredited Home Lenders*, 2006 U.S. Dist. LEXIS 50653, *12 n.4 (N.D. Ga., July 25, 2006)

---

[11] Although at this stage, Plaintiff and three opt-ins have been deposed, the parties have exchanged written discovery, and one Supervisor has been deposed.   Timmerman Decl. ¶ 2.   Regardless of what standard the Court chooses to apply, there is considerable evidence to evaluate whether notice is warranted, in the interest of efficiently adjudicating mass claims on a representational basis.

("similarly situated" requirement must be applied "with some rigor" in cases involving a substantial number of claimants); *Adair v. Wisconsin Bell, Inc.*, 2008 U.S. Dist. LEXIS 68942, *10 (E.D. Wis., Sept. 11, 2008) (legislative history of the collective action procedure supports requirement that plaintiff establish a factual basis for class claim before notice issues); Fed. R. Civ. P. 1 (rules should provide for "the just, speedy, and inexpensive determination of every action").

<div align="center">

**2.     The Supreme Court's Instruction in *Dukes* Must Be Considered in Evaluating Plaintiff's Request for Judicial Intervention.**

</div>

Federal courts have focused on these core case management and related due process themes as the foundation for the Supreme Court's landmark decision in *Dukes v. Wal-Mart Stores, Inc.*, 131 S. Ct. 2541 (2011). Although *Dukes* was decided under Rule 23 and the substantive claim at issue arose under the Civil Rights Act, two principles underlying that decision apply to all aggregate litigation, in order to achieve the overarching goals of case efficiency and due process which also lay at the foundation of the Court's decision in *Hoffman-LaRoche*. 493 U.S. at 169 ("The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity."). The first is "commonality," which requires the identification of a common question that will generate a common *answer* "apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551. Second, the Supreme Court expressly disapproves of "Trial by Formula," a phrase that encompasses trial plans based upon sampling methodologies that prevent a defendant from litigating its statutory defenses to *individual* claims. *Id.* at 2561. Plaintiff's request for judicial intervention,

therefore, must be analyzed to determine whether the specific "violation of law" upon which she bases her claim for overtime pay – and the claims of all other potential opt-in plaintiffs – can be resolved on a representational basis consistent with these principles. *See MacGregor v. Farmers Ins. Exchange*, 2011 U.S. Dist. LEXIS 80361, *13-15 (D.S.C. July 22, 2011) (relying on *Dukes* to deny notice under the FLSA because individualized inquiries would be required).

Plaintiffs always argue that *Dukes* is irrelevant in wage and hour cases, based upon its consideration of Rule 23's requirements. At least one Circuit Court has recognized, however, that these two issues – class certification under Rule 23 and "conditional certification" under the FLSA "are admittedly similar," *Myers v. The Hertz Corp.*, 624 F.3d 537, 556 (2d Cir. 2010), even if courts apply a different burden of proof in assessing whether "certification" is appropriate at different stages of the case. Nothing in the statutory language of the FLSA, Supreme Court, or Eighth Circuit precedent requires a lower or "minimal" standard to be met before notice is deemed appropriate, however. *Id.* at 555. Issuing notice to a large class of potential claimants can never be "appropriate" if individualized inquiries would pervade the case and, therefore, preclude this Court from answering the questions presented by Plaintiff and the putative class (how, why, and when off-the-clock work was performed) through representational proof. *See Saleen*, 2009 U.S. Dist. LEXIS 49891, *21-24 (even at the conditional certification stage, "plaintiffs must show that factual similarities or differences among the putative plaintiffs are such that that the case may be properly managed as a collective action" (internal citation omitted)); *Ruiz v. Serco, Inc.*, 2011 U.S. Dist. LEXIS 91215, *18-19 (W.D. Wis.,

Aug. 5, 2011) (declining to conditionally certify a proposed class of nearly 1,000 current and former employees based on *Dukes*).

**B.   Notice Is Not Appropriate Unless Plaintiff Establishes a Uniform Policy that Violates the Rights of the Class in the Same Way.**

**1.   "Off-the-Clock" Overtime Cases in This Circuit.**

In consideration of these principles, courts have concluded that certain FLSA claims lend themselves to collective adjudication, and others do not. When plaintiffs challenge the classification of a particular job as exempt and all class members share the same primary duty, for example, certification may be appropriate. *See Kalish v. High Tech Inst., Inc.*, 2005 U.S. Dist. LEXIS 8238, *11 (D. Minn., Apr. 22, 2005) (exempt status of instructors). Similarly, where an employer concedes that no compensation is paid for certain activities – the classic "donning and doffing" case where the employer disputes whether the activity at issue qualifies as "work" – a collective action may resolve a common question regarding compensability. *E.g.*, *Bouaphakeo v. Tyson Foods*, 2011 U.S. Dist. LEXIS 95814 (N.D. Iowa, Aug. 4, 2011) (donning/doffing protective equipment).

On the other hand, notice to a broad class is not appropriate in individualized "off-the-clock" claims where one claimant's testimony could not conceivably be representative of another employee's experience, consistent with due process. This Court has repeatedly recognized this core principle in wage and hour litigation. For example, in *Thompson v. Speedway SuperAmerica*, 2008 U.S. Dist. LEXIS 115050 (D. Minn., August 21, 2008), *adopted by* 2009 U.S. Dist. LEXIS 3816 (D. Minn., Jan. 20, 2009), Magistrate

Judge Erickson, in a decision adopted by Judge Schiltz, rejected a motion to conditionally certify a class of employees who claimed to have worked "off-the-clock, arguing that their time cards only reflected their scheduled hours, rather than the time they actually spent working[.]"   2008 U.S. Dist. LEXIS 115050, *11.   Like Plaintiff here, the *Thompson* claimants argued that the defendant "required" them and all similarly situated employees to work without compensation.[12]   *Id.*, *13.   The defendant in *Thompson* presented corporate policies that controverted the claimants' assertion that there was a centralized policy that required employees to work off-the-clock.   2008 U.S. Dist. LEXIS 115050, *17.   After considering decisions in numerous jurisdictions, *id.*, *21-23, the court concluded that "[w]here . . . highly individualized factual assertions are presented, without numeric substantiality, which remotely intimate the potential for an FLSA-violating practice, the Court should be hesitant to presume, in the absence of some cogent evidence, that the intimation is provable, or a universally applicable and established fact." *Id.*, *30-31.   Judge Schiltz agreed, finding no "colorable basis" to conclude that SuperAmerica had made a "corporate decision" to adopt a "policy-to-violate-the-policy" that would permit representative adjudication.   *See* 2009 U.S. Dist. LEXIS 3816, *4, 6

---

[12] The claimants in *Thompson* presented declaration testimony from eight employees, less than 1% of the total putative class.  *Id.* at *15.  Based upon an estimated putative class size of 789 individuals, Hall Decl. ¶ 4, Plaintiff makes even less of a showing.  *See also West v. Border Foods, Inc.*, 2006 U.S. Dist. LEXIS 46506, *6 (D. Minn., July 10, 2006) (denying certification where only "six (6) of the potential class of approximately 240 shift managers . . . were allegedly required by their store managers to work off-the-clock.").

(adopting the magistrate's decision, noting that plaintiffs failed to "suggest any realistic way of trying [their] claims on a class wide basis.").

Magistrate Judge Keyes and Judge Schiltz came to a similar conclusion in *Saleen*, a case involving an employer's "auto-deduct" policy for employee lunches – another popular collective action theory. *See Saleen*, 2009 U.S. Dist. LEXIS 49891, *affirmed by* 649 F. Supp. 2d 937. The plaintiffs in *Saleen*, as well as 211 opt-in plaintiffs who had filed consent by the time the Court determined the plaintiffs' certification motion, alleged that they all worked similar jobs, performing similar duties, under the same time-keeping system, and were all subject to a "uniform auto-deduction pay policy that . . . results in the continuous underpayment of wages[.]" 2009 U.S. Dist. LEXIS 49891, *3. The "policy" at issue automatically deducted 30-minutes from employees' time records for a presumed meal break. *Id.*, *4. Judge Keyes denied conditional certification because the plaintiffs' evidentiary showing revealed no "single decision, policy, or plan behind" the employer's instances of an alleged failure to pay overtime, and the record demonstrated that the case could not be appropriately managed as a collective action. *Id.*, *12-13. The "uniform automatic deduction policy" did not, on its face, violate the law; the employer was not refusing to pay employees who worked through their meal break. *Id.*, *14. Like *Thompson*, the plaintiffs advanced a theory that the employer had adopted "a policy-to-violate-the-policy," and they submitted 112 declarations from employees who stated they were denied overtime because they worked through lunch. *Id.*, *15. But the reasons any individual employee failed to take a meal break – and failed to report the issue to payroll – were "too varied for the Court to conclude that there is a single decision, policy, or plan

by [the employer] not to compensate its drivers . . . for time worked through meal breaks." *Id.*, *16.[13]   Based upon this variability, the Court also concluded that the case could not be "orderly or sensibly managed" as a collective action. *Id.*, *30.   Overruling plaintiffs' objections, Judge Schiltz agreed. 649 F. Supp. 2d at 942-43.   Consistent with this precedent, if Plaintiff does not rely upon a formal policy that compels off-the-clock work, she must come forward with substantial evidence that Verizon Wireless has established a uniform informal practice in the Mankato Call Center to violate the VZWTime policy and its corporate Code of Conduct.

### 2.    Every Call Center Case Must Be Decided On Its Own Facts.

Plaintiff cites numerous cases involving call center employees asserting off-the-clock claims, but her analysis is limited to simply urging this Court to follow the crowd. ECF No. 17, pp. 10-13.   Verizon Wireless can cite the Court to other cases, including decisions in this Circuit, where courts have reached the opposite conclusion based on similar facts. *See*, *e.g.*, *Andersen v. Wells Fargo Financial, Inc.*, 2012 U.S. Dist. LEXIS 23175, *11-14 (S.D. Iowa, Feb. 6, 2012) (denying conditional certification in a call center case where employer required employees to independently record their hours worked to the minute, but plaintiffs argued that they were required to boot-up their

---

[13] Like Plaintiff here, the plaintiffs in *Saleen* argued that there was "pressure on the drivers to work fast and to cover many pick-ups during their workday, and that this pressure left little or no time for a meal break." 2009 U.S. Dist. LEXIS 49891, *19.   But plaintiffs were alleging an overtime claim – not challenging the propriety of the employer's labor practices.

computers and perform work before the start of their shift).[14] The question in these cases, consistent with this Court's holdings in *Thompson* and *Saleen*, is whether the plaintiffs can prove at least a colorable claim, grounded in evidence, that the employer has established a corporate "policy-to-violate-the policy" – if the employer's actual "policy" is fully compliant with the law.

A closer review of these cases – beyond Plaintiff's parentheticals – proves the point. In this District, Plaintiff relies on *Burch* and *Lyons v. Ameriprise Financial, Inc.*, 2010 WL 3733565 (D. Minn., Sept. 10, 2010), and both are inapposite. In *Burch*, "each . . . call center employee's phone serves as the employee's time clock and work time is tracked through the time that the employee logs into and out of his phone[,]" 500 F. Supp. 2d at 1183, and the claimants described "an identical task that all potential class members had to perform before 'punching in' for work." *Id.* at 1188. Verizon Wireless does not use the phone system as a time-clock – employees report their *own* time on a timesheet, to the minute, and they are specifically instructed to report working time, including logging onto their computers, off the phones. Hall Decl. Exs. 1-6. In *Lyons*,

---

[14] *See also Richardson v. Wells Fargo Bank, N.A.*, 2012 U.S. Dist. LEXIS 12911, *25-27 (S.D. Texas, Feb. 2, 2012) (denying conditional certification in call center case alleging off-the-clock work where employer maintained a timekeeping system that permitted employees to input and edit entries that recorded all hours worked); *Brooks v. Bellsouth Telecommunications, Inc.*, 2009 U.S. Dist. LEXIS 20552, *23-28 (N.D. Ga., Feb. 10, 2009) (finding no commonality among claims that employees were forced to boot up their computers before the start of their shift, contrary to the employer's policy, where evidence showed that they were specifically instructed *not* to do so); *Adair*, 2008 U.S. Dist. LEXIS 68942, *14-15 (distinguishing between a "mechanical timekeeping system that, by its very nature, failed to capture its employees' entire time at work" and allegations by a few employees who state they arrived early or stayed late; conditional certification denied).

the plaintiffs alleged "they were instructed and trained to record only their scheduled shift time and *not* to record any pre-shift login time or post-shift logout time."  2010 WL 3733565, *2 (italics in original).  <u>Plaintiff (as well as the opt-in plaintiffs) has testified</u> <u>that the opposite was true at Verizon Wireless</u>.  They completed Verizon Wireless training modules, repeatedly, which instructed them to report *all* of their working time – to the minute – including time spent logging onto their computers.

Plaintiff's out-of-district cases are similarly distinguishable.  Like *Lyons*, many of these cases certified classes based upon widespread allegations that employees were specifically instructed to perform work off-the-clock – which Plaintiff herself unequivocally does *not* claim.[15]  Other cases challenged the timekeeping mechanics; many call centers have paid employees based upon their phone time, based upon a schedule with "exception" reporting,[16] or through the use of an electronic time-clock only

---

[15] *See, e.g., Swarthout v. Ryla Teleservices, Inc.*, 2011 WL 6152347, *1 (N.D. Ind., Dec. 12, 2011); *Lepkowski v. Telatron Marketing Group*, 2011 WL 338062, *10 (W.D. Pa., Feb. 1, 2011); *Dernovish v. AT&T Operations*, 2010 WL 143692, *1-2 (W.D. Mo., Jan. 12, 2010); *Beasely v. GC Services, Inc.*, 270 F.R.D. 442, 443 (E.D. Mo. 2010); *Sherrill v. Sutherland Global Services, Inc.*, 487 F. Supp. 2d 344, 349 (W.D.N.Y. 2007) (employer did not oppose notice); *Hens v. ClientLogic Operating Corp.*, 2006 WL 2795620, *1-2 (W.D.N.Y., Sept. 26, 2006).

[16] *See, e.g., Bishop v. AT&T Corp.*, 256 F.R.D. 503, 505 (W.D. Pa. 2009) (employees paid based upon hours worked during scheduled "tour"); *Fisher v. Michigan Bell Co.*, 665 F. Supp. 2d 819, 823 ("Defendant pays Plaintiffs based on their scheduled tours."); *Russell v. Illinois Bell Tel. Co.*, 575 F. Supp. 2d 930, 935 (N.D. Ill. 2008) (where plaintiff alleged "I was not informed that I was supposed to record my daily pre-tour and post-tour activities such as logging in and out of our computer system.").  It is undisputed that Verizon Wireless Representatives are trained – repeatedly -- to report all their working time, including time spent logging onto their computers.  Hall Decl. Ex. 1-6.

accessible after the employee has logged onto his computer[17]; such systems have been susceptible to challenge on a class-wide basis.  As Plaintiff notes, Verizon Wireless has been sued in other wage and hour cases,[18] *see* ECF No. 17, p. 6 n.23, and the Company has plainly taken steps to mitigate the risk of additional litigation through the implementation of a time and labor reporting system, workplace policies, training programs, a Code of Conduct, and compliance guidelines that are intended to ensure that every minute worked is paid.  Before Plaintiff should be permitted to challenge these facially compliant systems on behalf of a class, she must do more than simply cite other call center cases where notice has issued.  She must show that notice is appropriate in *this* case.  *Hoffman-LaRoche*, 493 U.S. at 169.  She has not done so.

---

[17] *See, e.g., Robinson v. Ryla Teleservices, Inc.*, 2011 U.S. Dist. LEXIS 147027, *3-4 (S.D. Ala., Dec. 21, 2011); *Sharpe v. APAC Customer Serv., Inc.*, 2010 WL 135168, *3 (W.D. Wis., Jan. 11, 2010) ("the issue in this case is whether defendant permitted customer service representatives to perform administrative tasks while they were not logged into their time tracking program[.]"); *Clarke v. Convergys Customer Mgmt. Group*, 370 F. Supp. 2d 601, 604 (S.D. Tex. 2005) (same).

[18] The one certification decision involving Verizon Wireless cited by Plaintiff, *McCray v. Cellco Partnership*, 2011 WL 2893061 (N.D. Ga., April 8, 2011), discloses virtually nothing regarding the common "practice" that required off-the-clock work, *id.*, *2, and simply dismisses the citation of contrary authority "consisting of non-binding district court cases[.]"  *Id.*  Given the lack of any real analysis in the decision, this Court may likewise decline to follow *McCray*.

C.     **Plaintiff Cannot Demonstrate that She is Similarly Situated to All Representatives in a Manner that Would Permit Collective Adjudication of Off-the-Clock Claims.**

1.     **Plaintiff Fails to Establish that She or Other Representatives Were Subject to a Commonly Applied Illegal Policy-to-Violate-the-Policy.**

Like the employers in *Thompson* and *Saleen*, the undisputed evidence at this stage of the case establishes that Verizon Wireless requires all hours to be independently recorded, Representatives certify the accuracy of these records when they submit them to payroll, and they are paid for the hours worked *and* recorded.   All Representatives are trained repeatedly regarding these requirements, and Plaintiff (and others) acknowledged her obligations under the VZWTime policy and the Code of Conduct to report *any* instance when she either voluntarily or involuntarily submitted a time record that was inaccurate.   This is not a case where reporting additional hours was discouraged – Plaintiff testified that management in the Mankato Call Center encouraged employees to work and submit overtime if needed to service Verizon Wireless customers.   Jennings Dep. 32, 101-102.

So, why did Plaintiff fail to report all her hours worked, and why didn't she complain about the underpayment of overtime, consistent with her obligations under the Code?   She "learned through training" that Verizon Wireless tracks phone activity of its Representatives, but such a practice certainly is not illegal.   Jennings Decl. ¶ 5.   "In order to meet Verizon's performance metrics" and "avoid possible disciplinary actions," Plaintiff states in her Declaration, she "had to be ready to take calls and log into [her] phone at the start of [her] scheduled shift."   *Id.*   In other words, Plaintiff worked off-the-

clock to improve her performance scores (at least as she perceived she was being evaluated), and to avoid speculative punishment, which she does not define, nor did she actually experience.  Jennings *was* disciplined during her employment as a Verizon Wireless Representative, but this counseling focused on her abusive attitude towards customers, not any failure on her part to complete her work or satisfy certain productivity standards.  Jennings Dep. 78-79, 84-88.  Verizon Wireless does not use "adherence" or "conformance" measurements, terms often used in call center litigation, to evaluate Representatives' performance.  Gumbel Dep. 111-112, 131; Hall Decl. ¶ 17.  Regardless, identifying performance metrics – even if they are unreasonable – does not violate the FLSA and cannot establish the basis for judicial notice.  *See*, *e.g.*, *Brickey v. Dolgencorp. Inc.*, 272 F.R.D. 344 (W.D.N.Y. 2011) (refusing to credit argument that labor budgets "compelled" managers to require employees to work off-the-clock as the basis for conditional certification).

Plaintiff does not even allege that supervisors told her to work off-the-clock. Rather, she speculates regarding management's "expectations," and she reacts to those perceived expectations.  To the extent *any* supervisor violated Verizon Wireless's policies – and there is no competent evidence they actually did so – their actions can only be decentralized and ad hoc; they do not illustrate a common policy.  "When alleged FLSA violations stem from the enforcement decisions of individual supervisors, without a company-wide policy or plan directing those enforcement decisions, collective treatment is not appropriate."  *MacGregor,* 2011 U.S. Dist. LEXIS 80361, *9-10.  Even if Plaintiff believed that meeting performance expectations were more important than

accurate time reporting, she has not established that Verizon Wireless established a "common policy" to violate the law. "At the end, instead of a common policy that violated the law, Plaintiff[] ha[s] only alleged a situation in which [she] w[as] too uninformed [or inefficient] to take care of [her] own business." *Blaney v. Charlotte-Mecklenburg Hosp.*, 2011 U.S. Dist. LEXIS 105302, *30 (W.D.N.C., Sept. 16, 2011). These allegations could never be proven on behalf of a class based upon representational evidence.

None of the evidence Plaintiff has submitted identifies a Verizon Wireless policy that violates the FLSA, or establishes a corporate "policy-to-violate-the-policy" that requires payment for all hours worked. Plaintiff and any number of her current or former co-workers may individually decide that they cannot report all their work time and meet performance expectations because it is convenient to log into their computer before they start working, or some other reason, but these personal, individualized decisions do not establish an illegal corporate policy that applies to all Representatives.[19] In other words, Plaintiff does not establish a colorable basis to claim that Verizon Wireless's policies require off-the-clock work. Rather, Plaintiff's allegations describe a "result, which [they] claim is caused by a conglomeration of defendant's [legal] policies and practices." *See*

---

[19] In *Dukes*, for example, the plaintiffs did not allege that the company had an express corporate policy against the advancement of women, but rather that individual local managers' discretion was exercised in favor of male employees, leading to an unlawful disparate impact. 131 S. Ct. at 2548. The Court noted an absence of "significant proof" that the company was operating under a "general policy of discrimination," and that the company's policy actually forbade discrimination. *Id.* at 2554. Individual supervisor decisions were at issue, and the plaintiffs' claims did not raise common questions susceptible to common answers. *Id.* at 2554-55.

*MacGregor*, 2011 U.S. Dist. LEXIS 80361, *8. Because she does not describe, even potentially, an *illegal* policy that impacts all Representatives the same way, she has not established a "similarly situated" class.

> **2.    In the Absence of Common Proof That Would Permit Adjudication of "Similarly Situated" Claims, They Cannot Be Managed Collectively.**

In the absence of a clearly articulated policy that required off-the-clock work, Verizon Wireless (and the Court) are left to guess at each potential opt-in plaintiff's possible theory of liability. Based upon their declarations and the deposition testimony, any opt-in plaintiff may claim (1) her supervisor told her that she needed to be "call ready" when she logged into the phone, notwithstanding the VZWTime policy and Code of Conduct mandate; (2) her supervisor "implied" that this was the case, based upon statements regarding adherence and conformance expectations; (3) she personally chose to ignore her Supervisor's instruction to wait until the start of her shift to boot-up her work computer; or (4) she independently decided to falsify her time records to improve her productivity, as Plaintiff herself alleges. Jennings Dep. 80-83, 182-183; Montenegro Dep. 26, 42-43, 50-51; Marie Dep. 121-122; Larson Dep. 37-38, 105; Engelby Decl. ¶ 5; Frederick Decl. ¶ 5. Yet other potential class members followed Verizon Wireless' timekeeping policies. Curran Decl. ¶¶ 7-12; Towle Decl. ¶¶ 5-7; Pepper Decl. ¶¶ 5-7; Brown Decl. ¶¶ 5-7. Therefore, in evaluating whether notice is appropriate, the "contours of th[is] action" are already clear, based upon the evidence submitted to the Court already. *Hoffman-LaRoche*, 493 U.S. at 171-2. Consistent with *Saleen* and *Thompson*,

Plaintiff must demonstrate, based upon this diverse evidence, that the case can be managed collectively.  She has not done so.

Verizon Wireless's estoppel defense offers another compelling example as to why certification in this case would be inappropriate.   While Plaintiff claims to have "routinely worked before [her] scheduled shift started and was not paid for it[,]" she also concedes that she was aware that Verizon Wireless *required* all working time to be reported and *prohibited* off-the-clock work.  She also conceded that, under the Code of Conduct, she was required to report the fact that she felt "compelled" by performance requirements to work without pay.  Certainly, Verizon Wireless is entitled to show in each individual's case that the company had no reason to know that he or she was working but not reporting the time.  *See*, *e.g.*, *Haviland v. Catholic Health Initiatives-Iowa, Corp.,* 729 F. Supp. 2d 1038, 1076 (S.D. Iowa 2010) ("Numerous courts have held that an individual is estopped from claiming . . . compensation when he violates an employer's reporting policy and, by doing so, precludes the employer's opportunity to verify and pay, or refute the claim." [collecting cases]).

Expanding this case now to include any current or former Representative with a grievance against Verizon Wireless would serve no rational purpose.  A New York court's recent decertification decision in *Seward v. IBM Corp.*, 2012 U.S. Dist. LEXIS 49688 (S.D.N.Y., January 12, 2012), is illustrative of how a typical call center case develops once the individual claims of the putative collective class are subjected to discovery when the employer's formal policy requires that employees are compensated for overtime work.  *Id.*, *9.  Some managers testify that they direct their employees to

report pre-shift overtime, *id.*, *11, 32, while others expected employees to be "call ready" when they started working. *Id.*, *18-9. Some plaintiffs testified that they believe they were required to boot up their computers without compensation, *id.*, *36, others "were not sure about their managers' expectations." *Id.*, *38. Others acknowledged that their managers imposed no such requirement, *id.*, *42, and still others testified that they arrived to work early for personal reasons. *Id.*, *46. Some opt-ins acknowledged their managers may not have known that they were working off-the-clock. *Id.*, *48. And of course, the managers' testimony was "in direct conflict with the testimony of opt-in plaintiffs who worked on their teams." *Id.*, *50. The same direct conflict exists here, even at this microcosmic level. *Compare* Engelby Decl. ¶ 11; Frederick Decl. ¶ 11; Larson Decl. ¶ 10; Montenegro Deco. ¶ 11; *with* Gumbel Dep. 81-82; Cobb Decl. ¶ 5; Meyer Decl. ¶ 4; Laughter Decl. ¶ 4.

The length of the court's decision in *Seward* and the citation to an extensive evidentiary record gives the reader a clear sense of the litigation costs incurred before the court reasonably concluded that "fairness requires that this collective action be decertified[.]" *Id.*, *95. Once the court decides that a case can no longer be managed as a collective action, however, the opt-in plaintiffs do not simply disappear. Following this Court's decision to deny certification in *Saleen*, Plaintiff's counsel filed 31 separate

lawsuits in federal courts across the country on behalf of hundreds of clients.[20]  Since
Plaintiff has asked to send notice to hundreds of current and former Verizon Wireless
employees in Minnesota, their individual claims would all be re-filed here if the Court
determines that the claims cannot be tried collectively.   This exercise can hardly be
described as an efficient way to "lower[] litigation costs for individual plaintiffs, and
decreas[e] the burden on the courts[.]"   ECF No. 17, p. 6.   It just explodes this Court's
docket – and all parties' litigation costs.

> **3.    The Fact that the Statute of Limitations Continues to Run on
> Non-Parties' Claims Does Not Justify Notice.**

As a final argument in support of the propriety of notice, Plaintiff argues that
"[p]rompt judicial notice is needed because claims of potential opt-in plaintiffs are

---

[20] *See Muldrow v. Waste Mgmt., Inc.*, 2:09-cv-02195-LSC (N.D. Ala.); *Lucero v. Waste
Mgmt., Inc.*, 2:09-cv-02283-MHM (D. Ariz.); *Rucker v. Waste Mgmt., Inc.*, 5:09-cv-
00339-BSM (E.D. Ark.); *Herniak v. Waste Mgmt., Inc.*, 1:09-cv-02566-WDM-BNB (D.
Colo.); *Mercury v. Waste Mgmt., Inc.*, 1:09-cv-02566-JA-DAB (M.D. Fla.); *Pasha v.
Waste Mgmt., Inc.*, 1:09-cv-3025-JOF (N.D. Ga.); *Godinez v. Waste Mgmt., Inc.*, 1:09-cv-
06800 (N.D. Ill.); *Nolan v. Waste Mgmt., Inc.*, 1:09-cv-1354-RLY-DML (S.D. Ind.);
*Newcomb v. Waste Mgmt., Inc.*, 5:09-cv-04084-MWB (N.D. Iowa); *Simmons v. Waste
Mgmt., Inc.*, 2:09-cv-02558-JWL-GLR (D. Kan.); *Mattingly v. Waste Mgmt., Inc.*, 3:09-
cv-867M (W.D. Ky.); *Allen v. Waste Mgmt., Inc.*, 2:09-cv-07055-AJM-DEK (E.D. La.);
*Buchanan v. Waste Mgmt., Inc.*, 1:090cv02863(CCB) (D. Md.); *DiCarlo v. Waste Mgmt.,
Inc.*, 1:09-cv-11843 (D. Mass.); *Harrison v. Waste Mgmt., Inc.*,  2:09-cv-14242-RHC-
VMM (E.D. Mich.); *Johnston v. Waste Mgmt., Inc.*, 1:09-cv-00364 (D.N.H.); *Webb v.
Waste Mgmt., Inc.*, Case 09-cv-835 (M.D.N.C.); *Tadda v. Waste Mgmt., Inc.*, 09-cv-1035
(D.N.M.); *Webb v. Waste Mgmt., Inc.*, 2:09-cv-05537(PGS)(ES) (D.N.J.); *Prado v. Waste
Mgmt., Inc.*, 2:09-cv-04072-JS-MLO (E.D.N.Y.); *Bjordahl v. Waste Mgmt., Inc.*, 1:09-cv-
0071-DLH-CSM (D.N.D.); *Henry v. Waste Mgmt., Inc.*, 3:09-cv-00410-WHR (S.D.
Ohio); *Argueta v. Waste Mgmt., Inc.*, 1:09-cv-00275-MBC (W.D. Pa.); *Frazier v. Waste
Mgmt., Inc.*, 3:09-cv-00275-MBC (W.D. Pa.); *Large v. Waste Mgmt., Inc.*, 09-cv-5091
(D.S.D.); *Jordan v. Waste Mgmt., Inc.*, 1:09-cv-01235-ejb (W.D. Tenn.); *Hollowell v.
Waste Mgmt., Inc.*, 2:09-cv-00971-DB (D. Utah); *Mondrey v. Waste Mgmt., Inc.*, 2:09-
cv-00546-RAJ-JEB (E.D. Va.); *Durham v. Waste Mgmt., Inc.*, 2:09-cv-01552-MJP (W.D.
Wash.); *Kirk v. Waste Mgmt., Inc.*, 09-cv-01024-RTR (E.D. Wis.).

diminished, if not extinguished, due to the running of the statute of limitations."  ECF No. 17, p. 14.  Plaintiff is accurate, at least with respect to her statement that the statute with respect to any opt-in plaintiff's claim under the FLSA continues to run until she files written consent to join a proposed collective action.  *See* 29 U.S.C. § 256(a).  But various statutes of limitations continue to run on every citizen's claims in this country consistent with applicable law, until he or she decides to take action in court and file a claim.  Under the FLSA, this fact simply expresses the will of Congress; the enactment of the Portal-to-Portal Act added an "opt-in" provision to the FLSA to reduce the expanded liabilities and burdens to employers resulting from "representative actions."  *See* Portal-to-Portal Act §§ 256(a)-(b), 257.  Other than simply stating this fact, Plaintiff does not explain why this Court should take *any* action in order to preserve the potential claim of a <u>non-party</u> to this litigation, to the detriment of possible affirmative defenses to such claims.  Although this reasoning is often raised in support of accelerated "conditional certification," it finds no support in *Hoffman-LaRoche*, the FLSA, its legislative history, or logic.  Certainly, the unusual concept that the Court should be actively interested in assisting other plaintiffs to assert claims should not prevent the recognition that this case is not appropriate for notice even at this "early stage."  *See West*, 2006 U.S. Dist. LEXIS 96963, *7 ("[N]either the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper.").

**D.    If the Court Elects to Intervene, the Notice Process Must Be Managed in Consideration of All Parties' and Non-Parties' Legitimate Interests.**

      **1.    The Court Should Not Order the Disclosure of Employees' Private Information to Facilitate Notice.**

If the Court decides that notice is "appropriate" under *Hoffman-LaRoche*, the Court also has an obligation to manage the notice process to ensure the accomplishment of its neutral purpose, and that both Verizon Wireless's legitimate interests and its employees' reasonable expectations of privacy are protected. *See* 492 U.S. at 171 (courts have "managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way."). Verizon Wireless's employees have not consented to the release of private personnel information to law firms that may seek to represent them in litigation which, to date, they have expressed no interest despite extensive solicitation by Plaintiff's counsel.

The preferred method of informing potential litigants regarding a pending wage and hour case has been by first-class mail. *See Hinterberger v. Catholic Health Sys.*, 2009 U.S. Dist. LEXIS 97944 (W.D.N.Y., Oct. 21, 2009) (collecting cases). The names and last known addresses for Representatives employed at the Mankato Call Center in the last three years is all that is required to facilitate notice; Verizon Wireless should not be compelled to produce more information, especially private personnel data, regarding these employees. Certainly, the subjects of this data have a legitimate interest in the protection of private identifying information such as birthdates, and they had no reason to expect that this data would be provided to a private law firm when the data was disclosed to Verizon Wireless as part of its employment processes. Plaintiff has made no showing

that last known addresses will be insufficient to provide reasonable notice to the class, and therefore, her requests for the birthdates – or any other sensitive identifying information -- regarding her former co-workers should be denied.  *See Calderon v. GEICO General Ins. Co.*, 2011 U.S. Dist. LEXIS 2815, *23 (D. Md., Jan. 12, 2011) ("[G]iven the privacy interests of GEICO employees, this Court will not order GEICO to produce any information regarding the Social Security numbers or dates of birth of potential opt-in plaintiffs.").[21]

## 2.    Plaintiff's Use of an Authorized Notice Form and Verizon Wireless Personnel Data Should Be Restricted.

Verizon Wireless also requests that the Court set strict parameters to clearly define the manner in which names and addresses may be used.  The Court should (1) restrict Plaintiff's use of the data for the sole purpose of sending notice of this litigation only; (2) restrict Plaintiff's communications with potential opt-ins to issuance of an approved notice by United States mail, on one occasion only; and (3) restrict Plaintiff's written communications with potential opt-in class members to the approved notice *only*.  *See Hipp v. Liberty Nat'l Life Ins. Co.*, 164 F.R.D. 574, 576 (M.D. Fla. 1996) (authorizing use of employee addresses for purposes of issuing written notice on one occasion, and stating that "any other communication between the Plaintiffs or their counsel and these sought after parties is strictly prohibited[.]").

---

[21] *See also Harvey v. AB Electrolux*, 2012 U.S. Dist. LEXIS 31507, *13-14 (N.D. Iowa, March 9, 2012) (denying request for telephone numbers); *Fisher v. Michigan Bell Tel. Co.*, 665 F. Supp. 2d 819, 829-30 (E.D. Mich. 2009) (denying request for partial social security numbers); *Martinez v. Cargill Meat Solutions*, 265 F.R.D. 490, 501 (D. Neb. 2009) (denying request for telephone and social security numbers, collecting cases).

Plaintiff's request to market this litigation by sending monthly "reminders" to the putative class that "time is running out" has been denied by many, many courts that reasonably recognize the narrow line that divides advising potential opt-in plaintiffs of the existence of this litigation – and encouraging participation.  These courts restrict the use of judicially-approved notice accordingly.  *See*, *e.g.*, *Robinson*, 2011 U.S. Dist. LEXIS 147027, *21 n.7 (denying request for reminder notice); *Sharpe,* 2010 U.S. Dist. LEXIS 95377, *6 (limiting contact to putative class members to "one-time mailing of the approved notice.").  As Judge Crabb noted in *Witteman v. Wisconsin Bell, Inc.*, where Plaintiff's counsel made the same request:

> I agree that the reminder is unnecessary and potentially could be interpreted as encouragement by the court to join the lawsuit.  The purpose of notice is simply to inform potential class members of their rights.  Once they receive that information, it is their responsibility to act as they see fit.

2010 U.S. Dist. LEXIS 8845, *9 (W.D. Wis., Feb. 2, 2010).  *See also Knispel v. Chrysler Group, LLC*, 2012 U.S. Dist. LEXIS 21188, *21-22 (E.D. Mich., Feb. 12, 2012) (same); *Smallwood v. Illinois Bell Tel. Co.*, 710 F. Supp. 2d 746, 753-54 (N.D. Ill., May 6, 2010) (same); *Wlotkowski v. Michigan Bell Tel. Co.*, 267 F.R.D. 213, 220 (E.D. Mich., April 16, 2010) (same); *Barnwell v. Corr. Corp. of America*, 2008 U.S. Dist. LEXIS 104230, *28 (D. Kan., Dec. 8, 2008) (same).

Once the members of the prospective collective class are aware of the litigation, "reminders" or other forms of communication with prospective members of the collective action serve no legitimate purpose.  Here, Plaintiff's proposed notice accomplishes the purpose authorized by *Hoffman-LaRoche*:  the procedure will ensure that members of the

prospective class receive formal court-authorized notice of these proceedings. Any further communication with potential opt-in class members beyond the issuance of written notice would, when combined with reference to such judicially-authorized communications, implicitly involve the Court in the encouragement of litigation, which *Hoffman-LaRoche* certainly does not contemplate. *See* 493 U.S. at 181 (Scalia, J., dissenting) ("'Stirring up litigation' was once exclusively the occupation of disreputable lawyers, roundly condemned by this and all American courts."); *Calderon*, 2011 U.S. Dist. LEXIS 2815, *23 ("Plaintiffs' request to send reminder notices has the potential to unnecessarily stir up litigation, and will therefore be denied." [internal quotation omitted]). Accordingly, Verizon Wireless requests that the Court order that the disclosed employee names and addresses may be used for purposes of notice only, and that the Court-approved notice may be issued on one occasion and will not be accompanied or followed by any additional correspondence or communications, including cover letters, follow-up letters, telephone contacts, or other soliciting efforts.

### 3.    Verizon Wireless Should Not Be Compelled to Post Notice on its Business Premises.

In an offhand way, Plaintiff also asks this Court to compel Verizon Wireless to post notice "in a conspicuous location in all break/lunch rooms at its Minnesota call center." ECF No. 17, p. 16. This is wholly unreasonable and unnecessary. As noted above, first-class mailing of notice is the preferred method, and courts in this Circuit and elsewhere hold that alternative forms of notification (such as a workplace posting) should not be ordered unless plaintiff presents specific facts showing that alternative methods are

necessary. *See Morris v. R.A. Popp*, 2012 U.S. Dist. LEXIS 19273, *17 (D. Neb., Jan. 20, 2012) ("plaintiff provides no justification for posting the notice."); *Martinez*, 265 F.R.D. at 500-1 ("There is no evidence personal mailing will be an unreliable means of delivering notice to the putative plaintiffs[,]" (collecting cases)). *See also Shajan v. Barolo, Ltd.*, 2010 U.S. Dist. LEXIS 54581, *5 (S.D.N.Y. June 2, 2010); *Hintergerger*, 2009 U.S. Dist. LEXIS 97944, *40-41. The only group likely to be reached by a posting is current employees; Verizon Wireless will be able to provide accurate mailing addresses for current employees, making such posting at the place of business unnecessary. *See Shajan*, 2010 LEXIS 54581, *5 ("Since all current employees will be receiving the notice [via first class mailing], there is no need to require defendants to post the notice in the workplace.").

Plaintiff's request that Verizon Wireless post notice on its business premises must also be rejected because such an order would violate Verizon Wireless's First Amendment rights. The United States Constitution safeguards not only the right to speak, but also protects against compulsion to disseminate a message with which one disagrees. *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (First Amendment guarantee "includes both the right to speak freely and the right to refrain from speaking at all."). In *Pacific Gas & Elec. Co. v. Public Util. Comm'n*, 475 U.S. 1, 15 (1986), the Supreme Court held that requiring a litigant to include its adversary's views in its billing, "impermissibly requires [the litigant] to associate with speech with which [the litigant] may disagree." Posting notice on Verizon Wireless's business premises unnecessarily requires Verizon Wireless to disseminate a message to persons outside the putative class

and with which it disagrees.   Even though such a right is not absolute, Supreme Court precedent requires that any order burdening the exercise of free speech must be narrowly tailored to serve a compelling state interest.   *Id.* at 19.   Posting notice is certainly not narrowly tailored because it would be broadcast to many more individuals than is necessary (*i.e.*, non-class members employed at the call center).

### 4.    A Sixty-Day Opt-in Period Is More Than Sufficient Time.

Finally, Plaintiff has requested a ninety-day "opt-in period" during which consent forms may be filed.   She has not explained why it would take a notice recipient three months to make a decision regarding joinder, and there is no legitimate reason to extend the opt-in period this long.   The parties proposed, *see* Joint Rule 26(f) Report (Doc. 9), and the Court established, a fact discovery cut-off date of February 1, 2013, in this case. *See* Pretrial Scheduling Order (Doc. 14).   Conceivably, a ninety-day opt-in period would leave the parties with only a few months to complete class discovery.   An opt-in period of sixty days is more than enough time to determine who will elect to join this lawsuit as a party-plaintiff, and consistent with case management practice in this District.   *See*, *e.g.*, *Simmons v. Valspar Corp.*, 2011 U.S. Dist. LEXIS 39340, *19 (D. Minn., April 11, 2011) ("60 days is sufficient time to notify putative class members and allow them to decide whether to opt in without further delaying this litigation.").[22]

---

[22] *See also Smallwood v. Illinois Bell Tel. Co.*, 710 F. Supp. 2d 746, 753 (N.D. Ill. 2010) ("This Court finds a 60-day period is a fair period that provides ample opportunity for prospective class members to opt in) (citing cases); *Sharpe*, 2010 U.S. Dist. LEXIS 95377, *5 ("I agree that a 60-day opt-in period for potential class members is sufficient.").

## IV.    CONCLUSION

For all of these reasons, Verizon Wireless requests that Plaintiff's motion for conditional certification be denied.  She has not shown, regardless of the standard used to test her offer of proof, that Verizon Wireless systematically denies its employees the right to payment for all their hours of work, including overtime.

Date:  May 9, 2012

<div style="margin-left:40%">

*s/ Jeffrey A. Timmerman*

Andrew J. Voss (#0241556)
avoss@littler.com
Jeffrey A. Timmerman (#0352561)
jtimmerman@littler.com
John H. Lassetter (#0389009)
jlassetter@littler.com
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN  55402.2136
Telephone: 612.630.1000
Facsimile:  612.630.9626

**ATTORNEYS FOR DEFENDANT**

</div>

Firmwide:111066496.3 068719.1002

44